Alex McBean Law Office, PLLC
P. Alex McBean, #10390
mcbean04@gmail.com
Attorney for Plaintiffs
P.O. Box 1726
Bountiful, UT 84011
385-319-1137

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JANN DESCANZO;<br>VERONICA BONDOC;<br>GLEN SEGUNDINO;<br>MARIANNE PONIO; and those<br>similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GRAND AMERICA HOTELS &<br>RESORTS, INC.; and<br>SINCLAIR SERVICE CO.,<br><br><br>        Defendants. | PROPOSED CLASS ACTION<br>COMPLAINT<br><br><br>**Case No. 2:19-cv-00443-CMR**<br><br>**Magistrate Judge Cecilia M. Romero**<br><br><br><br><br>JURY TRIAL DEMANDED |

## I.    INTRODUCTION

1.1    Jann Descanzo, Veronica Bondoc, Glen Segundino, and Marianne Ponio ("Plaintiffs") are citizens of the Philippines, are Filipino, and studied tourism and hospitality in the Philippines. As part of their continued education in their chosen fields, Plaintiffs came to the United States to participate in a J-1 visa

internship program at the Grand America Hotel, an upscale hotel in Salt Lake City, Utah. However, once in the United States, they found that few things that the hotel had promised about their internships were in fact true.

1.2    Also known as the Exchange Visitor Program, a J-1 visa internship is intended to be an educational and cultural exchange between people of the United States and other countries that provides intern-participants with hands-on experience and training. The program must not be used by employers as a substitute for ordinary employment.

1.3    Since at least 2017, Defendants GRAND AMERICA HOTELS & RESORTS, INC. ("Grand America") and SINCLAIR SERVICE CO. ("Sinclair") have brought J-1 visa interns to the U.S to work at the Grand America Hotel.

1.4    Pursuant to the program, Grand America was required to create a training and internship plan for each intern-participant. Grand America was also required to certify to the United States Department of State ("State Department") that the hotel would follow its internship plan for each intern.

1.5    While still in the Philippines, Plaintiffs each obtained internships at the Grand America Hotel. Grand America provided each of them with the hotel's promised internship plan, and Plaintiffs paid recruitment fees to secure the promised internships and travel costs to the United States.

1.6    The State Department likewise relied on Grand America's certifications in issuing Plaintiffs their J-1 visas.

1.7    When Plaintiffs arrived in the U.S., Grand America did not provide the internships it promised in the plans provided the State Department.

1.8    Instead, Grand America used J-1 visa interns as substitutes for ordinary employees. For example, Grand America promised each Plaintiff their internship would include supervised training in five different phases, in five different departments of the hotel. But Grand America did not offer Plaintiffs any training and did not complete the phases of its promised internship plans. Similarly, Grand America promised to expose Plaintiffs to specific cultural activities, but, in fact, did not deliver any of those promised cultural experiences.

1.9    When Plaintiffs complained that Grand America was not following the internship plans, the hotel threatened Plaintiffs with deportation if they did not do the work they were ordered to perform.

1.10    In addition, Grand America did not pay Plaintiffs at least minimum wage for all hours worked when factoring in fees and costs charged to Plaintiffs before or during the first work week that were primarily for the benefit of the employer, including the recruitment fees Plaintiffs were required to pay for the internships and travel expenses.

1.11    Finally, Grand America treated Plaintiffs and other Filipino J-1 workers differently than other employees performing the same jobs. The hotel required Filipino workers to work longer hours and perform less desirable tasks than other employees. And Grand America supervisors made racist comments about Filipino workers, including calling Filipinos "slow" and "lazy."

## II.    JURISDICTION AND VENUE

2.1    Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

2.2    Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.    PARTIES

3.1    At all times material to the allegations of the complaint, Plaintiffs were citizens of the Philippines who resided in Utah.

3.2    Executed FLSA consent to join forms for the Plaintiffs are attached as Exhibit 1.

3.3    At all times material to the allegations of the complaint, Defendant Grand America was a Wyoming corporation registered to do business in Utah with its principal place of business in Utah.

3.4     At all times material to the allegations of the complaint, Defendant Sinclair was a Wyoming corporation registered to do business in Utah with its principal place of business in Utah.

## IV.    BACKGROUND OF THE J-1 VISA INTERNSHIP PROGRAM

4.1     Created by the Mutual Educational and Cultural Exchange Act of 1961, the J-1 visa internship program—also known as the Exchange Visitor Program—is intended to "increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange." Pub. L. No. 87-256, 75 Stat. 527, *codified at* 22 U.S.C. § 2451 *et seq*.

4.2     The J-1 visa internship program seeks to do so by "enhanc[ing] the skills and expertise of exchange visitors in their academic or occupational fields through participation in structured and guided work-based training and internship programs and to improve participants' knowledge of American techniques, methodologies, and technology." 22 C.F.R § 62.22(b).

4.3     J-1 visa interns "***must not*** be used as substitutes for ordinary employment or work purposes; nor may they be used under any circumstances to displace American workers." *Id.* (emphasis added).

4.4     The State Department administers the J-1 visa internship program.

4.5    To obtain visas for J-1 interns, employer-participants are required to submit Training/Internship Placement Plans ("Internship Plans") to the State Department detailing the training and internships they intend to provide to intern-participants. Employer-participants are required to certify the truth of the statements made in their Internship Plans under penalty of perjury.

## V.    STATEMENT OF FACTS

### A.    Defendants jointly operate the Grand America Hotel.

5.1    Defendants Grand America and Sinclair own and operate the Grand America Hotel, which is the largest hotel in Salt Lake City, and jointly control employment and operations decisions at the Grand America Hotel.

5.2    Defendant Grand America entered into employment contracts with Plaintiffs and those similarly situated.

5.3    Sinclair holds itself out as "doing business as" the Grand America Hotel, including to the Utah Division of Corporations.

5.4    Sinclair is also responsible for paying Grand America employees, including J-1 visa interns.

5.5    Defendants jointly determined the rate and method of payment for Plaintiffs and those similarly situated.

5.6    Defendants jointly maintained employment records for Plaintiffs and those similarly situated, including weekly paystubs for each J-1 intern like that attached as Exhibit 6.

5.7    Defendant Grand America had the power to hire and fire Plaintiffs and those similarly situated.

5.8    Upon information and belief, Sinclair had the power to hire and fire Plaintiffs and those similarly situated.

5.9    Defendant Grand America supervised and controlled the work schedule and conditions of employment of Plaintiffs and those similarly situated.

**B.    Defendants have a history of using undocumented low-wage workers.**

5.10    Defendants have a history of relying on low-wage workers to operate the Grand America Hotel.

5.11    In the past, Defendants employed undocumented workers to fulfill the hotel's need for low-wage workers.

5.12    In 2011, investigators from the United States Department of Homeland Security ("DHS") found that Grand America was employing 133 undocumented workers to operate the hotel.

7

5.13    After this investigation, DHS issued a written warning, and Grand America terminated the undocumented workers.

5.14    But Defendants continued to employ undocumented workers at the Grand America Hotel after receiving the DHS warning.

5.15    After the DHS investigation and warning, Defendants created sham employment agencies through which the hotel continued to employ undocumented workers.

5.16    DHS investigators uncovered this unlawful conduct, and Grand America entered into a non-prosecution agreement with the U.S. Attorney for the District of Utah in 2014.

5.17    Pursuant to that agreement, Grand America agreed to pay a $1.95 million penalty.

5.18    Details regarding this history of illegal activity are available from the United States Department of Justice at https://www.justice.gov/usao-ut/pr/grand-america-hotels-and-resorts-enters-non-prosecution-agreement-us-attorney-s-office.

5.19    Stymied in their attempts to use undocumented labor, Defendants turned to non-immigrant visa programs, including the J-1 visa internship program, to import cheap foreign labor to operate the hotel.

**C.    Defendants use J-1 visa interns as substitutes for ordinary employees.**

5.20   To obtain J-1 visas for the interns they recruited, Defendants were required to submit Internship Plans to the State Department.

5.21   Through their Internship Plans, Defendants certified to the State Department as follows:

1.    I have reviewed, understand, and will follow this Training/Internship Placement Plan *(T/IPP)*;

2.    I will contact the Sponsor at the earliest possible opportunity if I believe that the Trainee or Intern is not receiving the type of training delineated on this T/IPP;

3.    I will actively support the Sponsor by adhering to all applicable regulatory provisions that govern this program *(see 22 CFR Part 62)*;

4.    The Trainee or Intern named in this T/IPP will not displace full-or part-time, seasonal or permanent American workers, or serve to fill a labor need;

5.    I will conduct the required periodic evaluations of the Trainee or Intern named in this T/IPP;

6.    I will notify the designated Sponsor contact at the earliest available opportunity regarding any concerns about, changes in, or deviations from this T/IPP.

7.    I will notify the Sponsor in the event of an emergency involving the Trainee or Intern named in this T/IPP, as well as any information that I receive about the Trainee or Intern that might have an effect on that exchange visitor's health, safety, or welfare;

8.    I will notify the Sponsor if I receive information regarding a serious problem or controversy involving the Trainee or Intern named in this T/IPP that could be expected to bring the Department of State, the Exchange Visitor Program, or the

Sponsor's exchange visitor program into notoriety or disrepute;

9.    I am participating in this Exchange Visitor Program in order to provide the Trainee or Intern named in this T/IPP with training or an internship as delineated in this T/IPP;

10.    I certify that this training or internship meets all the requirements of the Fair Labor Standards Act, as amended (*29 U.S.C. 201 et seq.*) I also certify that training or internships in the field of agriculture meet all requirements of the Migrant and Seasonal Worker Protection Act, as amended (*29 U.S.C. 1801 et seq.*).

11.    I declare and affirm under penalty of perjury that the statements and information made herein are true and correct to the best of my knowledge, information and belief. The law provides severe penalties for knowingly and willfully falsifying or concealing a material fact, or using any false document in the submission of this form.

*See, e.g.,* Exs. 2 at 4, 3 at 4, 4 at 4, 5 at 4.[1]

5.22    The State Department relied on Defendants' certifications when it issued J-1 visas to Plaintiffs and proposed class members.

5.23    Plaintiffs and proposed class members paid fees in excess of $3,000 each to become J-1 visa interns at the Grand America Hotel.

---

[1] While two of the four internship plans submitted as exhibits lack Defendants' signatures, Defendants were required to sign the document before submitting them to the State Department and did submit the internship plans to the State Department.

5.24   Plaintiffs and those similarly situated paid for their travel expenses to and from the United States.

5.25   If Defendants were simply seeking low-wage menial work from non-immigrant visa holders, they should have used the H-2B visa program.

5.26   Had Defendants used the H-2B visa program rather than the J-1 internship program, they could not have charged—or permitted their recruiters to charge—recruiting fees, because charging such fees is prohibited by law, including by 29 C.F.R. § 503.16.

5.27   Likewise, had Defendants used the H-2B visa program rather than the J-1 internship program, they would have been responsible for the travel costs of their workers to and from their home countries. *Id.*

5.28   By using the J-1 internship program instead of the H-2B program, Defendants improperly shifted costs, including for recruiting and travel, onto Plaintiffs and those similarly situated, while improperly saving themselves thousands of dollars per worker.

**D.   Defendants recruited Plaintiffs through the J-1 visa internship program.**

5.29   Pursuant to their pattern and practice, Defendants recruited Plaintiffs and proposed class members while they were in the Philippines.

5.30    To obtain their J-1 visas, Defendants submitted Internship Plans to the State Department for each Plaintiff and proposed class member while Plaintiffs and proposed class members were still in the Philippines.

**Jann Descanzo**

5.31    <u>Defendants promised Mr. Descanzo an internship.</u> In 2016, Mr. Descanzo received a Bachelor of Science degree in hospitality and tourism from a college in the Philippines.

5.32    After completing his degree, Mr. Descanzo looked for an internship at an American hotel to bolster his career in hospitality and tourism.

5.33    While still in the Philippines, Mr. Descanzo obtained an offer for an internship at the Grand America Hotel.

5.34    Before beginning his internship, Defendants provided Mr. Descanzo with an Internship Plan, which is attached to this Complaint as Exhibit 2 (the "Descanzo Internship Plan").

5.35    Defendants' Internship Plan for Mr. Descanzo described the internship Defendants offered to provide and, by signing the form, Defendants

certified that the description of the internship was true and correct. *See id.* at 4, 6,

8, 10, 12.[2]

     5.36   The Descanzo Internship Plan included five phases, with detailed

objectives:

> Phase 1, Orientation: "The objective of this phase is for the participant
> to be introduced to the general policies, standards and procedures of
> the hotel. The participant will be given a tour of the facilities, as well
> as be introduced to the staff within each department."
>
> Phase 2, Garde Manager: "The objective of this phase is to introduce
> the participant to the daily operations of the Garde Manager. This
> phase will equip the participant with the knowledge and skills to
> safely and effectively manage the back of the house operations."
>
> Phase 3, Service Standards and Meats Dept.: "The objective of this
> phase is for the participant to get an overview of the daily operations
> of the Meats Department. During this phase the participant will be
> thoroughly trained on the aspects of safety, law, and procedures of the
> meats department in a restaurant business."
>
> Phase 4, Saucier Department: "The objective of this phase is to give
> the participant an overview of the daily operations and expectations of
> the saucier department in a high-paced restaurant environment."
>
> Phase 5, Culinary Management Training: "The objective of this phase
> is to give the participant an overview of supervisory duties such as the
> scheduling, labor and inventory control, and supervising staff. This
> objective will focus on the Participant's food service management and
> organization skills."

---

[2] While this version of the internship plan lacks Defendants' signatures, Defendants were required to sign the
document before submitting it to the State Department and did submit the document to the State Department.

*See id.* at 3, 5, 7, 9, 11.

5.37    For each phase, Defendants' Internship Plan for Mr. Descanzo also included specific goals; an assigned supervisor with appropriate experience; a description of knowledge, skills, and techniques to be learned during the phase; a description of how the knowledge, skills and, techniques would be taught; and a description of how new skills and competencies gained in the internship would be measured.

5.38    Defendants' Internship Plan for Mr. Descanzo also promised he would participate in the following cultural experiences: a Dickens Christmas Festival, a Winter Solstice Festival, the Hogle Zoo, and the X-Dance Film Festival.

5.39    Mr. Descanzo paid fees of at least $3,000 to obtain his internship at Defendants' Grand America Hotel, plus travel expenses.

5.40    The reality of Mr. Descanzo's job at the Grand America Hotel. Defendants did not provide Mr. Descanzo the internship experience he was promised. Rather, Defendants employed Mr. Descanzo at the Grand America Hotel as nothing more than a low-wage worker Defendants needed to operate the hotel.

5.41    Defendants did not permit Mr. Descanzo and the other J-1 visa interns who worked in the kitchen to move past the first stage of their purported internships.

5.42   Instead, Mr. Descanzo was stuck working the Garde Manager (*i.e.*, cold foods)—the first phase of his internship plan—for his entire internship.

5.43   According to Defendants' Internship Plan, Executive Chef Fernando Soebranis was supposed to supervise Mr. Descanzo's internship. But Mr. Descanzo rarely saw Chef Soebranis and thus did not receive the "day to day supervision and direct feedback" from Chef Soebranis that was promised in his Internship Plan.

5.44   Defendants also did not follow the Internship Plan's promise that Mr. Descanzo would work 32 hours a week. Instead, Defendants often required Mr. Descanzo to work 16-hour days and up to 60 hours a week.

5.45   During one two-week pay period, Defendants required Mr. Descanzo to work more than 75 hours a week. *See* Ex. 6 at 1(paystub).

5.46   Supervisors gave Mr. Descanzo and other interns energy drinks to keep them awake during these long shifts.

5.47   Defendants often required Mr. Descanzo and other Filipino interns to work longer hours and to perform less desirable tasks than other non-Filipino employees performing the same work.

5.48   Mr. Descanzo and several other interns complained to Defendants' sponsor that Defendants were not complying with their Internship Plans.

5.49    After the complaints by Mr. Descanzo and other interns, Grand America's Head Chef Yasu Kanagae and Chef Victor Duranee confronted Mr. Descanzo and the other interns. Defendants' chefs told Mr. Descanzo and the other J-1 visa interns that if they did not perform the work they were ordered to perform, the hotel would transfer them to the cafeteria for the remainder of their internships, which was not part of the Internship Plans, but was instead seen as a punishment.

5.50    After that meeting, Defendants did, in fact, transfer one of the J-1 visa interns to the cafeteria. Mr. Descanzo and the other interns therefore believed they too would be sent to the cafeteria if they complained again.

5.51    Finally, despite the promises in Defendants' Internship Plan, Defendants did not provide any opportunities for Mr. Descanzo or the other J-1 interns to participate in any cultural activities.

**Veronica Bondoc**

5.52    <u>Defendants promised Ms. Bondoc an internship</u>. Ms. Bondoc attended college in the Philippines, where she studied subjects related to hospitality and tourism.

5.53    While still in the Philippines, Ms. Bondoc looked for an internship at an American hotel to bolster her career in hospitality and tourism.

5.54    While still in the Philippines, Ms. Bondoc obtained an offer for an internship at the Grand America Hotel.

5.55    Before beginning her internship, Defendants provided Ms. Bondoc with an Internship Plan, which is attached to this Complaint as Exhibit 3 (the "Bondoc Internship Plan").

5.56    Defendants' Internship Plan for Ms. Bondoc described the internship Defendants offered and, by signing the form, Defendants certified that the description of the internship in the form was true and correct. *See id.* at 4, 6, 8, 10, 12.[3]

5.57    The Bondoc Internship Plan included five phases, with detailed objectives:

> Phase 1, Orientation: "The Participant's initial weeks in the hotel will be dedicated to providing an Orientation that introduces the Participant to hotel policies, procedures, operations, and customer service standards."
>
> Phase 2, Basic Banquet Training: "The objective of this phase is to introduce the participant to the catering and banquet department of an upscale hotel. In this phase, the participant will be trained on how to manage catering projects, meeting customer expectations, as well how to organize the daily operations of a functioning catering and banquet department."

---

[3] While this version of the internship plan lacks Defendants' signatures, Defendants were required to sign the document before submitting it to the State Department and did submit the document to the State Department.

> Phase 3, Banquet Operations - Advanced Training: "The objective of this phase is to further the Participant's training in the banquet department. This phase is designed to give the Participant advanced experience in the banquet and catering department where the previous phase ended."
>
> Phase 4, In Room Dining: "The objective of this phase is to introduce the Participant to the Rooms Service Department. The Participant will be heavily trained on meeting expectations under a strict timeline."
>
> Phase 5, Restaurant Operations: "The objective of this phase is to introduce the Participant to the daily operations and expectations of operating an upscale American restaurant. This objective will be heavily focused on customer service skills and interaction."

*Id.* at 3, 5, 7, 9, 11.

5.58   For each phase, Defendants' Internship Plan for Ms. Bondoc also included specific goals; an assigned supervisor with appropriate experience; a description of knowledge, skills, and techniques to be learned during the phase; a description of how the knowledge, skills, and techniques would be taught; and a description of how new skills and competencies gained in the internship would be measured.

5.59   Defendants' Internship Plan for Ms. Bondoc also promised she would participate in the following cultural experiences: a Dickens Christmas Festival, a Winter Solstice Festival, the Hogle Zoo, and the X-Dance Film Festival.

5.60   Ms. Bondoc paid fees of at least $3,000 to obtain her internship at Defendants' Grand America Hotel, plus travel expenses.

18

5.61   <u>The reality of Ms. Bondoc's job at the Grand America Hotel</u>.
Defendants did not provide Ms. Bondoc the internship experience she was promised. Rather, Defendants employed Ms. Bondoc at the Grand America Hotel as nothing more than a low-wage worker Defendants needed to operate the hotel.

5.62   After an hour-long orientation, Defendants assigned Ms. Bondoc to work in banquets.

5.63   Ms. Bondoc remained in banquets for the first six months of her internship, with no noticeable difference between the basic and the advanced stages of this stage of the "internship."

5.64   For the remaining six months of her internship, Defendants assigned Ms. Bondoc to work as a telephone cashier taking room service orders.

5.65   Defendants never provided Ms. Bondoc with experience in restaurant operations, as was promised in Defendants' Internship Plan.

5.66   Defendants often required Ms. Bondoc to work 16 hours a day and well in excess of the 32 hours a week described in Defendants' Internship Plan.

5.67   Defendants often required Ms. Bondoc and other Filipino interns to work longer hours and to perform less desirable tasks than other non-Filipino employees performing the same work.

5.68   When Ms. Bondoc complained to her supervisor, Regis Perret, about Defendants' failure to follow the Internship Plan, Mr. Perret responded that Defendants would not provide Ms. Bondoc with the full internship experience she was promised because she was a good cashier and the hotel therefore needed her to continue working as a cashier.

5.69   Defendants concern was only to fill a position necessary for the operation of their hotel, not with fulfilling their promise to provide Ms. Bondoc with an internship.

5.70   Finally, despite promises in Defendants' Internship Plan, Defendants did not provide any opportunities for Ms. Bondoc or the other J-1 interns to participate in any cultural activities.

**Glen Segundino**

5.71   Defendants promised Mr. Segundino an internship. Mr. Segundino attended college in the Philippines, where he studied subjects related to tourism.

5.72   Mr. Segundino looked for an internship at an American hotel to bolster his career in tourism.

5.73   While still in the Philippines, Mr. Segundino obtained an offer for an internship at the Grand America Hotel.

5.74   Before beginning his internship, Defendants provided Mr. Segundino with an Internship Plan, which is attached to this Complaint as Exhibit 4 (the "Segundino Internship Plan").

5.75   Defendants' Internship Plan for Mr. Segundino described the internship Defendants offered and, by signing the form, Defendants certified that the description of the internship in the form was true and correct. *See Id.* at 4, 6, 8, 10, 12.

5.76   The Segundino Internship Plan included five phases, with detailed objectives.

Phase 1, Orientation: "The Participant's initial weeks in the hotel will be dedicated to providing an Orientation that introduces the Participant to hotel policies, procedures, operations, and customer service standards."

Phase 2, Basic Banquet Training: "The objective of this phase is to introduce the participant to the catering and banquet department of an upscale hotel. In this phase, the participant will be trained on how to manage catering projects, meeting customer expectations, as well how to organize the daily operations of a functioning catering and banquet department."

Phase 3, Banquet Operations - Advanced Training: "The objective of this phase is to further the Participant's training in the banquet department. This phase is designed to give the Participant advanced experience in the banquet and catering department where the previous phase ended."

> Phase 4, In Room Dining: "The objective of this phase is to introduce
> the Participant to the Rooms Service Department. The Participant will
> be heavily trained on meeting expectations under a strict timeline."
>
> Phase 5, Restaurant Operations: "The objective of this phase is to
> introduce the Participant to the daily operations and expectations of
> operating an upscale American restaurant. This objective will be
> heavily focused on customer service skills and interaction."

*Id.* at 3, 5, 7, 9, 11.

5.77   For each phase, Defendants' Internship Plan for Mr. Segundino also

included specific goals; an assigned supervisor with appropriate experience; a

description of knowledge, skills, and techniques to be learned during the phase; a

description of how the knowledge, skills, and techniques would be taught; and a

description of how new skills and competencies gained in the internship would be

measured.

5.78   Defendants' Internship Plan for Mr. Segundino also promised he

would get to participate in the following cultural experiences: a Dickens Christmas

Festival, a Winter Solstice Festival, the Hogle Zoo, and the X-Dance Film Festival.

5.79   Mr. Segundino paid fees and costs of at least $3,000 to obtain his

internship at Defendants' Grand America Hotel, plus travel expenses.

5.80   The reality of Mr. Segundino's job at the Grand America Hotel.

Defendants did not provide Mr. Segundino the internship experience he was

promised. Rather, Defendants employed Mr. Segundino at the Grand America

22

Hotel as nothing more than a low-wage worker that Defendants needed to operate the hotel.

5.81    Defendants provided Mr. Segundino with little to no training or supervision and required him to perform menial work, primarily in banquets or the Garden Café.

5.82    Defendants did not rotate Mr. Segundino through the different phases of his Internship Plan. For example, Defendants did not allow Mr. Segundino to work in in-room dining or lobby lounge work, which Defendants staffed primarily with non-J-1 workers.

5.83    Defendants also did not consistently provide Mr. Segundino the 32 hours a week promised in his Internship Plan. *See id.* at 1 His work hours were inconsistent, depending on the needs of the hotel.

5.84    During slow times, Defendants provided Mr. Segundino with approximately four or five hours of work per day.

5.85    During busier times, Defendants required Mr. Segundino to work approximately twelve hours a day, sometimes more than five days a week.

5.86    Defendants often required Mr. Segundino and other Filipino interns to work longer hours and to perform less desirable tasks than other non-Filipino employees performing the same work.

5.87   In addition, Mr. Segundino repeatedly heard Grand America supervisors make disparaging and racist comments regarding Filipino workers, including that they were "slow" and "lazy."

5.88   One Grand America supervisor cursed at Filipino workers and frequently threatened to deport them.

5.89   On one occasion, Mr. Segundino complained about an assignment he had received; his supervisors, Paul Garcia and Roberto Martinez, responded by suspending him for two days and threatening that he could be sent back to the Philippines at any time.

5.90   Mr. Segundino also saw Defendants fire J-1 interns, who were then sent to their home countries, after they complained about Defendants' failure to move J-1 interns through the phases of their internship plans.

5.91   As a result of Defendants' conduct, Mr. Segundino was terrified that he too would be sent home and did not complain again despite Defendants' continued failure to follow the Internship Plan.

5.92   At the end of the internship, Mr. Segundino had learned little from the menial labor he performed at Defendants' hotel, he had exhausted his savings, and he was in debt to his aunt for the money he had borrowed to pay recruitment fees

and travel expenses. Mr. Segundino could not even afford the cost of a plane ticket home.

5.93    Finally, despite the promises in Defendants' Internship Plan, Defendants did not provide any opportunities for Mr. Segundino or the other J-1 interns to participate in any cultural activities.

**Marianne Ponio**

5.94    <u>Defendants promised Ms. Ponio an internship</u>. In 2016, Ms. Ponio received a bachelor's degree in hotel and restaurant management from a college in the Philippines.

5.95    After completing her degree, Ms. Ponio looked for an internship at an American hotel to bolster her career in hotel and restaurant management.

5.96    While still in the Philippines, Ms. Ponio obtained an offer for an internship at the Grand America Hotel.

5.97    Before beginning her internship, Defendants provided Ms. Ponio with an Internship Plan, which is attached to this Complaint as Exhibit 5 (the "Ponio Internship Plan").

5.98    Defendants' Internship Plan for Ms. Ponio described the internship Defendants offered and, by signing the form, Defendants certified that the

description of the internship in the form was true and correct. *See id.* at 4, 6, 8, 10, 12.

5.99    The Ponio Internship Plan included five phases, with detailed objectives.

> Phase 1, Orientation: "The objective of this phase is for the participant to be introduced to the general policies, standards and procedures of the hotel. The participant will be given a tour of the facilities, as well as be introduced to the staff within each department."
>
> Phase 2, Garde Manager: "The objective of this phase is to introduce the participant to the daily operations of the Garde Manager. This phase will equip the participant with the knowledge and skills to safely and effectively manage the back of the house operations."
>
> Phase 3, Service Standards and Meats Dept.: "The objective of this phase is for the participant to get an overview of the daily operations of the Meats Department. During this phase the participant will be thoroughly trained on the aspects of safety, law, and procedures of the meats department in a restaurant business."
>
> Phase 4, Saucier Department: "The objective of this phase is to give the participant an overview of the daily operations and expectations of the saucier department in a high-paced restaurant environment."
>
> Phase 5, Culinary Management Training: "The objective of this phase is to give the participant an overview of supervisory duties such as the scheduling, labor and inventory control, and supervising staff. This objective will focus on the Participant's food service management and organization skills."

*Id.* at 3, 5, 7, 9, 11.

5.100 For each phase, Defendants' Internship Plan for Ms. Ponio also included specific goals, an assigned supervisor with appropriate experience; a description of knowledge, skills, and techniques to be learned during the phase; a description of how the knowledge, skills, and techniques would be taught; and a description of how new skills and competencies gained in the internship would be measured.

5.101 Defendants' Internship Plan for Ms. Ponio also promised she would get to participate in the following cultural experiences: a Dickens Christmas Festival, a Winter Solstice Festival, the Hogle Zoo, and the X-Dance Film Festival.

5.102 Ms. Ponio paid fees of at least $3,000 to obtain her internship at Defendants' Grand America Hotel, plus travel expenses.

5.103 The reality of Ms. Ponio's job at the Grand America Hotel. Defendants did not provide Ms. Ponio the internship experience she was promised. Rather, Defendants employed Ms. Ponio at the Grand America Hotel as nothing more than a low-wage worker that Defendants needed to operate the hotel.

5.104 Defendants did not permit Ms. Ponio to complete the phases of her Internship Plan.

5.105 Instead, Defendants employed Ms. Ponio to work in the cafeteria and the pastry departments for her entire internship.

27

5.106 Ms. Ponio's work in the cafeteria consisted primarily of serving food to other employees and cleaning.

5.107 Ms. Ponio was not supervised by the Executive Chef, as Defendants' Internship Plan promised, but was instead supervised by a sous chef.

5.108 Defendants provided Ms. Ponio little, if any, meaningful training or education.

5.109 Defendants often required Mr. Ponio and other Filipino interns to work longer hours and to perform less desirable tasks than other non-Filipino employees performing the same work.

5.110 Finally, despite the promises in Defendants' Internship Plan, Defendants did not provide any opportunities for Ms. Ponio or the other J-1 interns to participate in any cultural activities.

5.111 After the internship was complete, Ms. Ponio had no money to repay the debts she had incurred to pay the fees required to obtain and travel to the internship; she had no money to pay for a plane ticket home.

**E.    Defendants discriminated against Filipino J-1 visa interns during their employment.**

5.112 Grand America supervisors repeatedly made disparaging and racist comments toward Filipino J-1 visa interns, including calling them slow and lazy.

5.113 One supervisor threatened to deport Filipino J-1 interns when they complained about the menial nature of the work Defendants assigned to them. The supervisor told the interns, "If you don't want to do the work that is assigned, you can be sent back to the Philippines immediately."

5.114 Defendants also required Plaintiffs and other Filipino J-1 interns to work longer hours and perform less desirable tasks than the non-Filipino employees. For example, supervisors permitted non-Filipino workers to leave work early but required Filipino J-1 workers to clean up and begin prep for the following day. Filipino J-1 workers were generally required to do more prep work than non-Filipino workers, and Filipino J-1 workers were not allowed to participate in tasting events, which involved direct interaction with hotel guests.

**F.    Defendants engaged in trafficking of J-1 visa interns.**

5.115 The State Department relied on the statements Defendants made under penalty of perjury in their Internship Plans when issuing J-1 visas to Plaintiffs and members of the proposed class.

5.116 Defendants also created a working environment that led Plaintiffs to believe that if they did not continue working for Defendants without complaint,

they would be suspended or moved to less desirable positions at the hotel, that were not within their promised Internship Plans.

5.117 Defendants further created a working environment that led Plaintiffs to believe that if they did not continue working for Defendants without complaint, they would be terminated and forced to return to the Philippines.

5.118 Defendants further created a working environment that led Plaintiffs to believe that if they did not continue working for Defendants without complaint, they would suffer reputational harm, including negative repercussions from their schools in the Philippines.

5.119 Defendants therefore obtained Plaintiffs' labor and services by threats of serious harm and threats of abuse of law or legal process.

**G.    Defendants engaged in racketeering.**

5.120 <u>The enterprise</u>. Grand America, Sinclair, Alliance Abroad Group ("Alliance," Defendants' J-1 visa sponsor for Plaintiffs), and International Recruitment Exchange Services, Inc. ("IRES," Defendants' recruiter based in the Philippines) formed an association-in-fact called the "Enterprise."

5.121 In the alternative, the "Enterprise" is defined as Grand America and Sinclair; Grand America, Sinclair, and Alliance; or Grand America, Sinclair, and IRES.

5.122 The Enterprise was formed for the purpose of inducing the State Department to issue visas to the J-1 visa interns and then benefiting from that conduct during the course of the employment of Plaintiffs and those similarly situated by, among other things, employing Plaintiffs as low-wage workers without having to pay the travel costs, recruiting costs, and higher visa fees associated with H-2B workers.

5.123 The Enterprise continues to operate with this same purpose. Indeed, Defendants appear to be currently recruiting  a new wave of J-1 visa interns.

5.124 Racketeering activities. Using the Enterprise, Defendants participated in a fraudulent scheme by making false representations to the State Department regarding the terms and conditions of employment at the Grand America Hotel.

5.125 The false representations included promises that Plaintiffs and those similarly situated would be interns rather than ordinary employees.

5.126 All of these fraudulent statements constituted fraud in foreign labor contracting pursuant to 18 U.S.C. § 1351.

5.127 Moreover, sending the documents in furtherance of this fraud to the State Department and to Plaintiffs and those similarly situated constituted wire and mail fraud pursuant to 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

5.128 <u>Defendants' fraud caused damage to Plaintiffs' money and property</u>. The State Department relied on Defendants' fraudulent descriptions of the J-1 visa internships for Plaintiffs and those similarly situated in Defendants' Internship Plans in issuing visas for Plaintiffs and those similarly situated.

5.129 The fraudulent representations caused Plaintiffs and those similarly situated to lose money and property by inducing them to pay fees and costs, including recruiting fees and travel expenses they would not have had to pay if they were properly classified as H-2B workers.

5.130 The only persons harmed by these misrepresentations were Plaintiffs and those similarly situated, who paid these fees and costs in the expectation of receiving genuine internships, as required by the J-1 visa program.

## VI.    COLLECTIVE ACTION ALLEGATIONS

6.1    Plaintiffs bring their Fair Labor Standards Act ("FLSA") claims as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves and all other similarly situated current and former employees of Defendants.

6.2    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "FLSA Class" as follows:

> All persons who worked for the Grand America Hotel
> under J-1 intern visas.

6.3     All potential FLSA Class Members are similarly situated because, among other things, they were all employees of Defendants and, upon information and belief, all suffered from the same policies of Defendants—namely, their illegal policies of forcing J-1 visa interns to pay fees and costs primarily for the benefit of the employer without reimbursement, which caused their effective wage to fall below the minimum wage.

## VII.   RULE 23 CLASS ALLEGATIONS

7.1     Plaintiffs allege all claims as a Fed R. Civ P. 23 class action on their own behalf and on behalf of the class for which they seek certification.

7.2     Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "Rule 23 Class" as follows:

> All persons who worked for the Grand America Hotel under J-1 intern visas.

7.3     Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "Rule 23 Sub-Class" as follows:

> All persons with Filipino race, ethnicity, or ancestry who worked at the Grand America Hotel under J-1 intern visas.

7.4     The classes are so numerous that joinder of all potential class members is impracticable. Plaintiffs do not know the exact size of the classes since that information is within the control of Defendants. Plaintiffs estimate there are

more than 100 persons in each proposed class and sub-class. The exact size of the class will be easily ascertainable from Defendants' records.

7.5     There are questions of law or fact common to the classes that predominate over any individual issues that might exist, including but not limited to:

a.  Whether Defendants engaged in fraudulent schemes, acts and misrepresentations to employ J-1 visa interns;

b.  Whether Defendants engaged in fraud in foreign labor contracting;

c.  Whether Defendants engaged in mail and wire fraud;

d.  Whether Defendants engaged in racketeering;

e.  Whether Defendants engaged in a pattern and practice of discriminating against Filipino J-1 visa interns;

f.  Whether Defendants created a hostile work environment for Filipino J-1 visa interns;

g.  Whether Defendants obtained labor and services from Plaintiffs and the proposed class by means of threats of serious harm and threats of abuse of law or legal process; and

h.  The nature and extent of damages.

7.6    The class claims asserted by Plaintiffs are typical of the class claims because Plaintiffs experienced the same or similar working conditions and pay practices as other J-1 visa interns.

7.7    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of low-wage, hourly, J-1 interns, like the class members here, who are unsophisticated, are unlikely to seek legal representation, cannot realistically navigate the legal system pro se, and whose small claims make it difficult to retain legal representation.

7.8    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs were Defendants' employees and were victims of the same violations of law as the other class members.

7.9    Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage and foreign workers.

7.10    The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

7.11   Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and the pertinent laws and claims are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

7.12   Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

7.13   Plaintiffs are unaware of any pending litigation commenced by members of the classes concerning the same controversy.

7.14   It is desirable to concentrate this litigation in this forum because all Defendants are registered to do business in this district and the acts and omissions giving rise to this action largely occurred in this district or on foreign soil.

7.15   This class action will not be difficult to manage because claims of the class are uniform, and the claims are susceptible to both class litigation and the use of representative testimony and representative documentary evidence.

7.16   The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain.

## VIII.  FIRST CLAIM FOR RELIEF
### Failure to Pay Minimum Wage in Violation of the Fair Labor

## Standards Act
## FLSA Class Against All Defendants

8.1     Plaintiffs assert this count on their own behalf and on behalf of all

other similarly situated employees pursuant to 29 U.S.C. § 216(b).

8.2     At all relevant times, Defendants had two or more employees.

Defendants' Internship Plans attached to this Complaint and which Defendants

certified as true and accurate state there are 1,800 full-time employees onsite at the

Grand America Hotel.

8.3     At all relevant times, Defendants had an annual dollar volume of sales

or business done of at least $500,000. In fact, according to Defendants' Internship

Plans, the annual revenue of the Grand America Hotel is between $3 million and

$10 million.

8.4     At all relevant times, Plaintiffs and those similarly situated were

engaged in commerce or in the production of goods for commerce. In particular,

Plaintiffs handled food, supplies, and tools necessary for their jobs that travelled in

interstate coverage.

8.5     Plaintiffs and all others similarly situated were "employees" as that

term is defined by 29 U.S.C § 203(e) because Defendants directly controlled the

work of Plaintiffs and those similarly situated, and Sinclair was responsible for

paying Plaintiffs and those similarly situated for their work.

8.6    For similar reasons, Defendants "employed" Plaintiffs and all others similarly situated as that term is defined by 29 U.S.C. § 203(g) because each Plaintiff and member of the FLSA Class was suffered or permitted to work by Defendants.

8.7    Finally, Defendants employed Plaintiffs and members of the FLSA Class pursuant to 29 U.S.C. § 203(d) because Defendants acted directly or indirectly in their interest in relation to Plaintiffs and members of the FLSA Class by, among other things, controlling when, where, and how Plaintiffs and members of the FLSA Class worked; maintaining employment records for Plaintiffs and members of the FLSA Class; setting the terms of employment for Plaintiffs and members of the FLSA Class; and having the power to hire and fire Plaintiffs and members of the FLSA Class.

8.8    Defendants violated the FLSA when they failed to pay Plaintiffs and the FLSA Class at least minimum wage for their work. Although Defendants paid Plaintiffs and FLSA Class members minimum wage or above for their hourly work once they arrived at the hotel, the fees Defendants required them to pay to obtain their visas and travel must be deducted from their wages, because those fees were principally for the benefit of Defendants. As a result, the effective wage for

Plaintiffs and those similarly situated was less than minimum wage for a substantial part of their employment.

8.9     Defendants' violations of the FLSA were willful under 29 U.S.C. § 255(a) because they knew or should have known that the recruitment and travel fees were primarily for the benefit of Defendants and thus Plaintiffs and all others similarly situated were entitled to unpaid minimum wage under FLSA and/or, upon information and belief, they failed to make adequate inquiry regarding whether the Plaintiffs and others similarly situated were properly paid the minimum wage.

8.10    Furthermore, Defendants' violations of the FLSA were willful under 29 U.S.C.     § 255(a) because Defendants sought to use J-1 visa holders to replace their previous workforce of undocumented workers.

8.11    Plaintiffs and all others similarly situated are entitled to recover unpaid minimum wages, liquidated damages, attorneys' fees, costs, and post-judgment interest. 29 U.S.C. §§ 206, 216(b).

### IX.    SECOND CLAIM FOR RELIEF
### Civil RICO Violation Pursuant to 18 U.S.C. § 1964(c)
### Rule 23 Class Against All Defendants

9.1     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

9.2    Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by violating 18 U.S.C. §§ 1962(c) and 1964(c).

9.3    Defendants and the Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate the fraud in foreign labor contracting statute (18 U.S.C. § 1351) and the mail and wire fraud statutes (18 U.S.C. § 1341 and 18 U.S.C. § 1343).

9.4    By conducting the Enterprise through a pattern of racketeering, Defendants caused injury to Plaintiffs and those similarly situated.

9.5    Among other things, each of these RICO violations caused Plaintiffs and those similarly situated to suffer loss of past, current, and prospective wages and to spend unpaid time working as opposed to pursuing other interests. In addition, Defendants' RICO violations caused Plaintiffs to pay fees and costs to obtain their visas and travel to the United States to work for Defendants.

9.6    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## X.    THIRD CLAIM FOR RELIEF
### Discrimination Based on Race, Ethnicity, and Ancestry in Violation of 42 U.S.C. § 1981
### Rule 23 Subclass Against All Defendants

10.1    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

10.2   Plaintiffs are Filipino and are within the class protected by Section 1981.

10.3   Defendants are employers for purposes of Section 1981.

10.4   Defendants employed Plaintiffs and those similarly situated.

10.5   Defendants recruited Plaintiffs for employment at the Grand America Hotel, made representations to Plaintiffs about the terms and conditions of their employment, and entered into contracts acknowledging themselves as Plaintiffs' employer.

10.6   Defendants created, condoned, and failed to prevent and correct a hostile work environment for Plaintiffs during their employment, because of their race, ethnicity, and ancestry.

10.7   Creation of a hostile work environment and discrimination in terms and conditions of employment are adverse employment actions.

10.8   Defendants did not create a hostile work environment for similarly situated, non-Filipino employees and treated such employees more favorably than Plaintiffs and those similarly situated.

10.9   Defendants' actions described herein were intentional and taken with malice and with reckless indifference to Plaintiffs' federally protected rights.

10.10 Defendants failed to take reasonable care to prevent and to correct the unlawful and discriminatory practices described herein.

10.11 As a direct and proximate cause of Defendants' discriminatory actions and conduct, Plaintiffs have suffered, and will continue to suffer damages including, but not limited to, emotional distress and other compensatory damages in an amount to be determined at trial; punitive damages in an amount to be determined at trial; and attorneys' fees and costs.

## XI.    FOURTH CLAIM FOR RELIEF
### Violation of Trafficking Victims Protection Act
### Rule 23 Class Against all Defendants

11.1   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

11.2   Defendants violated the Trafficking Victims Protection Act by violating 18 U.S.C. § 1589.

11.3   Defendants obtained Plaintiffs' labor and services by means of threats of serious harm and threats of abuse of law or legal process.

11.4   Defendants engaged in a scheme, plan, or pattern intended to cause Plaintiffs to believe that, if Plaintiffs did not provide Defendants with their labor and services, they would suffer serious harm.

## XII.   DEMAND FOR JURY TRIAL

12.1   Plaintiffs demand a trial by jury for all issues so triable.

## XIII.  PRAYER FOR RELIEF

Plaintiffs on their own behalf and on behalf of proposed class members, pray for judgment against Defendants as follows:

A.      Certifying the Rule 23 Class and the Rule 23 Sub-Class, appointing the named Plaintiffs as class representatives of the respective classes they seek to represent, and appointing Plaintiffs' counsel as class counsel;

B.      Conditionally and finally certifying the FLSA Class;

C.      At the earliest possible time, permitting Plaintiffs to give notice of this collective action to the members of the FLSA Class;

D.      Granting judgment in favor of Plaintiffs and against all Defendants;

E.      Awarding Plaintiffs and the classes their actual damages and any applicable statutory damages;

F.      Awarding Plaintiffs and those similarly situated their costs;

G.      Awarding Plaintiffs and those similarly situated their attorneys' fees;

H.      Awarding Plaintiffs and members of the classes all appropriate equitable and injunctive relief;

I.      Awarding Plaintiffs and members of the classes punitive, exemplary, and liquidated damages as allowed by law;

I.      Awarding Plaintiffs and members of the classes prejudgment and post-judgment interest, when allowable by law; and

J.      Granting such other relief as this Court deems just and proper.

ALEX MCBEAN LAW OFFICE

By:  /s/ P. Alex McBean
    P. Alex McBean, #10390
    Alex McBean Law Office, PLLC
    Email: alex@alexmcbeanlaw.com
    503 West 2600, Suite 200
    Bountiful, Utah 84010
    Telephone:  358.347.0727

TOWARDS JUSTICE

    Alexander Hood, *PHV pending*
    Email: alex@towardsjustice.org
    1410 High Street, Suite 300
    Denver, Colorado 80218
    Telephone:  720.441.2236

ASIAN AMERICANS ADVANCING JUSTICE – LOS ANGELES

    Christopher M. Lapinig, *PHV pending*
    1145 Wilshire Blvd.
    Los Angeles, California 91107
    Telephone:  213.977.7500
    Facsimile:   213.977.7595

TERRELL MARSHALL LAW GROUP PLLC

Beth E. Terrell, *PHV pending*
Email: bterrell@terrellmarshall.com
Erika L. Nusser, *PHV pending*
Email: enusser@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone:  206.816.6603
Facsimile:   206.319.5450

*Attorneys for Plaintiffs*